**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

LARRY BOVEE and MARY DENNI,
Individually and on
Behalf of All Others Similarly Situated,

Plaintiffs,

v.

THE HOME DEPOT, INC.,

Defendant.
_______________________________/

Case No.:

**JURY TRIAL DEMANDED**

# CLASS ACTION COMPLAINT

Plaintiffs Larry Bovee and Mary Denni ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through undersigned counsel of record, bring this action against Defendant The Home Depot, Inc. ("Home Depot"). The allegations contained herein, which are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions and counsel's investigations, and upon information and belief as to all the other matters, are as follows:

## I. INTRODUCTION

1. This action is brought on behalf of Plaintiffs, and others similarly situated, that purchased goods sold by Defendant throughout the United States, who bore the economic burden of tariffs imposed by the President Donald Trump

("Trump") Administration under the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1701, et seq.), and against Defendant who shifted the economic burden of the IEEPA tariffs to consumers throughout the United States by increasing prices on imported goods as well as U.S.-sourced goods not subject to the tariffs. Defendant now receives an inequitable windfall by recovering from the federal government tariff costs that Defendant passed on to consumers, like Plaintiffs, who purchased goods from Defendant, and therefore, are the real parties in interest to the IEEPA tariff refunds.

2. Defendant collected hundreds of millions of dollars in unlawful tariffs from consumers by raising prices on imported goods and U.S.-sourced goods while the Trump Administration IEEPA tariffs were in effect.

3. The tariff refund process, set in place by the federal government after the United States Supreme Court struck down the IEEPA tariffs, allows only the importer of record ("IOR") to apply for and receive a refund for any moneys paid for the import of goods. However, Defendant, as IOR, shifted the cost of these tariffs to its customers by way of price increases to products subject to tariffs and items not subjected to tariffs. Thus, it is Plaintiffs and similarly situated consumers who bore the tariff costs in the first place.

4. Defendant has not returned any portion of those costs it passed on to consumers, and it has no intention of doing so. It has, in short, generated and retained

a windfall from unlawful government action, and consumers—not Defendant—are the ones left paying for it.

5. This dispute arises from a fundamental inequity in the tariff refund process. Only the IOR may seek a refund for an unlawfully assessed tariff—but IORs merely advance the tariff cost at the border and recoup all or a substantial part of it through higher consumer prices. In economic reality, the consumer paid the illegal tariff.

6. This inequity is compounded when, as here, a tariff is struck down by the courts. Consumers, who bore the true economic burden, have no direct avenue for redress—they both lack a statutory cause of action in the Court of International Trade ("CIT") and standing to seek a refund. That right belongs exclusively to Defendant as the IOR, regardless of who actually paid. As designed, the refund process establishes that large corporations that passed the entire tariff cost onto their customers remain exclusively entitled to recover a full refund of tariffs the Supreme Court has since declared unlawful.

7. This lawsuit seeks to force Defendant to return funds collected from millions of consumers to cover IEEPA tariffs between February 2025 and February 2026. Defendant has made no commitment to compensate consumers for those payments. This act fails to reimburse consumers for the portion of the unlawful tariff

that was forced upon them by Defendant's across-the-board price increases, and also unfairly enriches Defendant at the expense of consumers.

8. Plaintiffs seek a judgment that requires Defendant to return to Plaintiffs, and others similarly situated, all IEEPA duties passed on to customers in the form of higher prices on products, with interest.

9. Plaintiffs also seek restitution of the tariff and tariff-related overcharges they, and others similarly situated, paid, or a proportionate share of any tariff refund Defendant recovers, together with interest, reasonable attorneys' fees, and costs.

## II. JURISDICTION

10. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because: (a) Plaintiffs and at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

11. The Court has personal jurisdiction over Defendant because Home Depot is headquartered in this district, conducts significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this

District, and Defendant's principal place of business is in this District. Defendant's, principal place of business, corporate headquarters and principal executive offices are located at 2455 Paces Ferry Road, Atlanta, Georgia 30339.[1]

## III. PARTIES

### A. Plaintiff

13. Plaintiff Larry Bovee is domiciled in Cocoa, Florida, and is therefore a citizen of the State of Florida. During the Class Period, Plaintiff purchased goods directly from Defendant in the State of Florida. Some or all of these products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Defendant's pass-through of IEEPA tariff costs.

14. Plaintiff Mary Denni is domiciled in Palm Bay, Florida, and is therefore a citizen of the State of Florida. During the Class Period, Plaintiff purchased goods directly from Defendant in the State of Florida. Some or all of these products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Defendant's pass-through of IEEPA tariff costs. Plaintiff also purchased other products that were sourced from within the United States and, while not subject to tariffs, were sold at inflated prices, due to Defendant spreading the IEEPA tariff costs

---

[1] *The Home Depot, Inc., Annual Report (Form 10-K)* (fiscal year ended Feb. 1, 2026), at 1 ("Our Store Support Center (corporate headquarters) is located at 2455 Paces Ferry Road, Atlanta, Georgia 30339."), https://www.sec.gov/Archives/edgar/data/354950/000162828026019436/hd-20260201.htm; *The Home Depot, Inc., Quarterly Report (Form 10-Q)* (quarter ended Aug. 2, 2026), at cover page (listing 2455 Paces Ferry Road, Atlanta, Georgia 30339 as the "Address of principal executive offices").

across its product line, so that purchasers of non-tariffed domestic goods also bore the tariff burden.

**B. Defendant**

15. Defendant The Home Depot, Inc. ("Home Depot" or "Defendant") is a Delaware corporation with its headquarters, principle executive offices, and principal place of business at 2455 Paces Ferry Road, Atlanta, Georgia 30339. Home Depot is registered with the Georgia Secretary of State as a foreign profit corporation, lists 2455 Paces Ferry Road, Atlanta, Georgia 30339 as its principal office address, and maintains as its registered agent CSC of Cobb County, Inc., 192 Anderson Street S.E., Suite 125, Marietta, Georgia 30060. At all relevant times, Defendant operated retail channels through which it sold imported products and U.S.-sourced products directly to consumers. Between February 4, 2025, and February 20, 2026, Defendant collected tariff costs from those consumers on goods subject to tariffs imposed under the International Emergency Economic Powers Act ("IEEPA"), as well as on goods not subject to tariffs imposed under IEEPA. The misconduct alleged herein originated from and was directed out of Defendant's headquarters and principal place of business in Atlanta, Georgia. Defendant has retail locations and sells goods throughout Georgia and the United States.

# IV. FACTUAL ALLEGATIONS

## A. Defendant is an Enormous Retailer of Imported Goods and U.S.-Sourced Goods

16. Defendant is the largest home improvement retailer in the United States. It imports a substantial volume of consumer goods into the Unites States and sells them to consumers throughout the country.

17. Home Depot purchases the goods it sells from vendors, suppliers, and manufacturers, including a substantial volume of goods made outside the United States, and resells them to consumers. Home Depot "maintain[s] a global sourcing program to obtain . . . products directly from manufacturers in the U.S. and around the world," and during fiscal year 2025 maintained sourcing offices in "Mexico, Canada, India, Vietnam, Taiwan and China, as well as certain locations in Europe."[2] Home Depot owns the inventory it offers for sale and sets the retail prices its customers pay, which its executives describe as a "portfolio approach" to pricing.[3]

18. For the imported goods it sells, Defendant's involvement begins before the goods enter the United States. As the IOR, Defendant signs the customs declaration, takes legal responsibility for compliance, and pays the tariff to U.S. Customs and Border Protection ("CBP"). On information and belief, Defendant serves as the IOR for a substantial portion of the imported goods it sells.

---

[2] *The Home Depot, Inc., Annual Report (Form 10-K) (fiscal year ended Feb. 1, 2026)*, at 3, https://www.sec.gov/Archives/edgar/data/354950/000162828026019436/hd-20260201.htm.

[3] *The Home Depot, Inc., Q2 FY2025 Earnings Call Transcript. August 19, 2025*. Published by Seeking Alpha.

19. Defendant's products are not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs. Defendant offers these U.S.-sourced goods to consumers in its stores alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

20. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it was the IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant recovered the tariff costs by raising prices across its products, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

21. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by Defendant 's decision to spread those same tariff costs across its sold products.

22. Consumers who purchased U.S.-sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

### B. The Trump Administration Invokes the IEEPA to Implement Tariffs

23. On February 4, 2025, Trump issued an executive order imposing a 10% tariff on Chinese imports.[4] In March 2025, Trump issued two more executive orders imposing a 25% tariff on goods imported from Canada and Mexico, respectively.[5] By April 2025, the Trump Administration had imposed tariffs on imports from most other U.S. trading partners.

24. The Trump Administration invoked the IEEPA as the legal basis for these tariffs. The IEEPA was originally designed to allow the President to regulate international commerce during declared national emergencies.[6] The Trump Administration pointed to drug trafficking across U.S. borders and the persistent American trade deficit as the legal emergencies justifying the IEEPA tariffs.[7]

25. The IEEPA tariffs did not operate in isolation. For example, for much of 2025, the effective rate on most Chinese electronics was approximately 45%: a 20% IEEPA layer on top of an already existing 25% Section 301 tariff.[8] At the peak

---

[4] Andrea Shalal et al., *Trump launches trade war with tariffs on Mexico, Canada and China*, Reuters (Feb. 1, 2025), https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/.
[5] *Id.*
[6] Christopher A. Casey et al., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, Cong. Rsch. Serv. R45618 (Sep. 1, 2025) https://www.congress.gov/crs-product/R45618.
[7] Shalal, *supra* note 1.
[8] Section 301 of the US Trade Act of 1974 authorizes the President to take all appropriate action, including tariffs, to remove a foreign government's practice that violates an international trade agreement and that restricts US commerce. 19 U.S.C. § 2411. Trump implemented Section 301 tariffs in 2018.

of the escalation in April-May 2025, average U.S. tariffs on Chinese imports reached 127.2% in early May 2025.[9]

26. On April 3, 2025, within days of the IEEPA tariffs going into effect, the first lawsuit challenging their legality was filed.[10] Despite palpable fear from business groups of incurring the Trump Administration's anger,[11] other lawsuits would eventually follow.[12] These filings were widely reported and as a major retailer, Defendant certainly tracked their progress.[13]

27. On February 20, 2026, the U.S. Supreme Court issued its opinion in *Learning Resources, Inc. v. Trump*, holding that the IEEPA did not authorize the President to impose the IEEPA tariffs and that they were invalid ab initio.[14]

28. The Supreme Court's decision in *Learning Resources* eliminated the legal basis for the IEEPA tariffs and created a pathway for IORs like Defendant to seek refunds of the tariffs previously collected by the federal government.

---

[9] Chad P. Bown, *US-China Trade War Tariffs: An Up-to-Date Chart, Peterson Institute for International Economics* (Nov. 14, 2025) (https://www.piie.com/research/piie-charts/2019/us-china-trade-war-tariffs-date-chart)

[10] *Emily Ley, Paper, Inc., d/b/a Simplified v. Trump*, No. 3:25-cv-464-TKW-ZCB (N.D. Fla. Apr. 3, 2025).

[11] Caitlin Oprysko¸ *'Everyone is terrified': Business and government officials are afraid to cross Trump on tariffs*, Politico (Apr. 4, 2025) (https://www.politico.com/news/2025/04/04/trump-tariffs-fear-lobby-business-congress-00006608)

[12] See. e.g. Doug Palmer¸ *Trump's tariffs could face more than one legal challenge*, Politico (Apr. 3, 2025), (https://www.politico.com/news/2025/04/04/first-lawsuit-filed-against-trumps-tariffs-00273646) Larry Neumeister, *A dozen states sue the Trump administration to stop tariff policy*, Associated Press (Apr. 23, 2025) (https://apnews.com/article/tariffs-lawsuit-what-states-sue-0d6531b7f60aaa2f7c6c35e0a944d4a9)

[13] *Id.*

[14] *Learning Resources, Inc. v. Trump*, 607 U.S. ___, 146 S. Ct. 628 (2026) (slip op. at 20).

## C. Consumers Incurred Price Increases on Defendant's Products While the IEEPA Tariffs Were in Effect

29. The IEEPA tariffs increased the costs that retailers, including Defendant, incurred on imported goods. Across the retail industry, companies responded by passing those increased costs on to consumers through higher prices. A survey of American chief executive officers ("CEO") found that a majority had already raised prices or were considering doing so in response to the tariffs,[15] and major retailers publicly announced tariff-driven price increases throughout 2025 and into 2026.[16]

30. Independent economic analysis confirms that a substantial portion of the tariff costs were passed through to U.S. consumers during the relevant period. The Federal Reserve found that pass-through to consumers for goods imported from China was at least 30% between April and December 2025.[17] Federal Reserve Bank of New York research found that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs.[18]

---

[15] *Here Are the Retailers Raising Prices as Trump Tariffs Take Hold*, CNBC (May 31, 2025), (https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html) (reporting the Chief Executive Group/AlixPartners survey of U.S. CEOs and individual retailer price-increase announcements).

[16] Megan Cerullo, *Walmart and Other Big Companies Say Tariffs Are Forcing Them to Hike Prices*, CBS News (Feb. 20, 2026) (https://www.cbsnews.com/news/walmart-trump-tariffs-general-merchandise-inflation/)

[17] *The Slow Climb: How Tariffs Gradually Raised Retail Prices in 2025*, Bd. of Governors of the Fed. Reserve Sys., FEDS Notes (Mar. 5, 2026) (https://www.federalreserve.gov/econres/notes/feds-notes/the-slow-climb-how-tariffs-gradually-raised-retail-prices-in-2025-20260305.html)

[18] Cerullo, *Walmart and Other Big Companies*, supra (reporting Federal Reserve Bank of New York research that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs).

31. These price increases were not confined to imported goods. Analyses of retail pricing found that prices rose on both imported and domestically produced goods as retailers spread tariff-related costs across their product lines.[19] Researchers estimated that tariff pass-through added roughly 0.7 percentage points to the Consumer Price Index by September 2025, and that the lowest-priced product varieties saw the steepest increases (around 5%) because retailers had the least room to absorb the cost in their margins.[20]

32. The cumulative burden on consumers was enormous. After years of moderating prices, consumer goods prices rose throughout 2025 and into 2026.[21] According to the Budget Lab at Yale University, tariffs accounted for an estimated 86% of the rise in prices for imported household goods, with the effect most pronounced for long-lasting durable goods such as cars, appliances, and furniture.[22] American consumers paid more than $231 billion in tariff costs between February 2025 and January 2026, an average of roughly $1,745 per family.[23]

33. Defendant's products are not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate

---

[19] *Are Tariffs Raising U.S. Retail Prices?* (updated), Econofact (Dec. 5, 2025) (https://econofact.org/are-tariffs-raising-u-s-retail-prices) (summarizing the Cavallo/Harvard Business School Pricing Lab analysis of online pricing at five major U.S. retailers, including price increases on domestically produced goods).
[20] *Id.*
[21] Yale Budget Lab, *Tracking the Economic Effects of Tariffs* (https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs)
[22] *Id.*
[23] *American Families Have Paid More Than $1,700 Each in Tariff Costs Since Trump Entered Office*, Joint Economic Committee Minority (Feb. 2026) (https://www.jec.senate.gov/public/_cache/files/7cc03e65-d40a-465f-9e88-09dd53d3502f/jec-fact-sheet-on-cost-of-tariffs-for-families-update.pdf)

within the United States and are not subject to IEEPA tariffs, which it offers to consumers alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

34. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it served as an IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant (like other major retailers) made a business decision to recover the tariff costs by raising prices across its products, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

35. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by its decision to spread those same tariff costs across its product line. Consumers who purchased U.S.-sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

36. Defendant maintains detailed transaction, pricing, and customer records, including point-of-sale data, online order histories, and payment and loyalty-program records, through which Defendant is able to identify a subset of the consumers during the Class Period who paid tariff-inflated prices attributable to the IEEPA tariffs.

37. Home Depot is the largest home improvement retailer in the United States. In fiscal year 2025, Home Depot reported sales of $164.7 billion, and it ended that year with 2,359 stores.[24] Home Depot's online business alone generates approximately $25 billion in sales, and its stores handle more than 1.6 billion transactions every year.[25]

38. A substantial share of Home Depot's merchandise is imported. On May 20, 2025, three and a half months after the first IEEPA tariffs took effect, Home Depot's Chief Executive Officer, Edward Decker ("Decker") told investors that "more than 50% of our purchases are sourced in the United States"—meaning that nearly half of Home Depot's purchases were sourced from abroad.[26] On the same call, an analyst described "a little less than 50% of your sales" as "coming from outside the U.S.," and Home Depot did not dispute the figure.[27]

39. Home Depot's own disclosures show that imported merchandise drove the cost increases it experienced while the IEEPA tariffs were in effect. On May 20, 2025, an analyst estimated that the tariffs would amount to "about a 5% tariff on your cost of goods" and asked how Home Depot was "approaching that from a pricing standpoint."[28] On August 19, 2025, Home Depot's Executive Vice President

---

[24] *The Home Depot, Inc., Q4 FY2025 Earnings Call Transcript*. February 24, 2026. Published by Seeking Alpha.
[25] *The Home Depot, Inc., Investor and Analyst Conference Transcript*. December 9, 2025. Published by FactSet CallStreet (https://ir.homedepot.com/~/media/Files/H/HomeDepot-IR/reports-and-presentations/the-home-depot-inc-hd-us-investor-conference.pdf).
[26] *The Home Depot, Inc., Q1 FY2025 Earnings Call Transcript*. May 20, 2025. Published by Seeking Alpha.
[27] *Id.*
[28] *Id.*

of Merchandising, William Bastek ("Bastek") told investors that for "imported goods, obviously, tariff rates are significantly higher today than they were when we spoke in May."[29] On February 24, 2026, Bastek reported that Home Depot's tariff "exposure was kind of mid-single digits," and Home Depot's Chief Financial Officer, Richard McPhail ("McPhail") attributed the year-over-year growth in Home Depot's inventory in part to "higher cost of inventory, reflecting tariffs."[30]

40. Publicly, Home Depot held itself out as a retailer that would not pass tariff costs on to its customers. On May 20, 2025, Bastek told investors that "we intend to generally maintain pricing across our portfolio . . . ***we don't see broad-based price increases for our customers at all going forward,***" adding that "[i]t's a great opportunity for us to take share."[31] The same day, McPhail told CNBC that "because of our scale, the great partnerships we have with our suppliers and productivity that we continue to drive in our business, ***we intend to generally maintain our current pricing levels across our portfolio***."[32] Later on the same call, Bastek "reiterate[d] our position as I . . . mentioned about ***not seeing broad based price increases*** at the Home Depot."[33]

---

[29] *The Home Depot, Inc., Q2 FY2025 Earnings Call Transcript*. August 19, 2025. Published by Seeking Alpha.
[30] *The Home Depot, Inc., Q4 FY2025 Earnings Call Transcript*. February 24, 2026. Published by Seeking Alpha.
[31] *The Home Depot, Inc., Q1 FY2025 Earnings Call Transcript*. May 20, 2025. Published by Seeking Alpha. (Emphasis added).
[32] *Home Depot Holds Prices Steady in Face of Tariff Pressures*, Spencer Musick, Furniture Today (May 20, 2025), (https://www.furnituretoday.com/tariffs/home-depot-holds-prices-steady-in-face-of-tariff-pressures) (reporting McPhail's interview with CNBC) (Emphasis added).
[33] *The Home Depot, Inc., Q1 FY2025 Earnings Call Transcript*. May 20, 2025. Published by Seeking Alpha. (Emphasis added).

41. Home Depot nonetheless passed tariff costs on to its customers. On August 19, 2025, Bastek told investors that because tariff rates on imported goods were "significantly higher," "as you'd expect, there'll be some modest price movement in some categories."[34] Home Depot also cut back on promotions to recover tariff costs. Bastek explained that "our job . . . is to help impact some of the tariff pressure, being a little less promotional in a couple of those garden areas," and when an analyst observed that "the decision to reduce promotional activity during the quarter was tied to the tariff situation," Bastek responded that "we did pull back."[35] Reducing promotions raised the prices consumers actually paid.

42. On November 18, 2025, Bastek reported that the growth in Home Depot's average ticket reflected, among other things, "modest price increases," and explained that "after some policy changes were made around tariffs . . . we would take some moderate price moves with the entire strategy to make sure we protected the project."[36]

43. At Home Depot's investor conference on December 9, 2025, an analyst asked how much of the tariff cost "had to flow through or pass through" to prices. Bastek answered that "we have passed on some modest price increases" as imported

---

[34] *The Home Depot, Inc., Q2 FY2025 Earnings Call Transcript*. August 19, 2025. Published by Seeking Alpha.
[35] *Id.*
[36] *The Home Depot, Inc., Q3 FY2025 Earnings Call Transcript*. November 18, 2025. Published by Seeking Alpha.

inventory flowed into Home Depot's stores, describing Home Depot's "portfolio approach" to "protect the project."[37]

44. On February 24, 2026—four days after the Supreme Court struck down the IEEPA tariffs—Bastek reported that the growth in Home Depot's average ticket "primarily reflects some price increases," and that Home Depot was "mostly done with tariff-related pricing actions as it relates to the impacts back to April." He quantified those actions: "our exposure was kind of mid-single digits. And then if you think of like SKU price, that's right about 3% just in terms of the impact."[38] McPhail added that "for 2026, you're likely to see ticket reflect that 3 percentage point increase in retail as we . . . are essentially done with our price actions."[39]

45. On May 19, 2026, an analyst asked how Home Depot would "lap the tariff-driven price increases." Bastek confirmed: "Yes, you're right. We are lapping some of the early tariff pieces . . . as those were introduced in late Q1 of last year and into Q2. . . . We talked at our investor conference around some of the pricing into the marketplace, and that's settled into the market. And so we see that as kind of 3%."[40]

---

[37] *The Home Depot, Inc., Investor and Analyst Conference Transcript*. December 9, 2025. Published by FactSet CallStreet (https://ir.homedepot.com/~/media/Files/H/HomeDepot-IR/reports-and-presentations/the-home-depot-inc-hd-us-investor-conference.pdf).
[38] *The Home Depot, Inc., Q4 FY2025 Earnings Call Transcript*. February 24, 2026. Published by Seeking Alpha.
[39] *Id.*
[40] *The Home Depot, Inc., Q1 FY2026 Earnings Call Transcript*. May 19, 2026. Published by Seeking Alpha.

46. On August 18, 2026, after Home Depot had received its IEEPA tariff refunds, an analyst asked whether Home Depot would need any "price reinvestment" as it began "lapping some of the tariff-driven price increases from last year." Bastek answered that "we don't see any changes from what we've already communicated," and confirmed that Home Depot's ticket growth that quarter again included "some same SKU AUR"—that is, higher prices on the same items.[41]

47. News coverage had reported Home Depot's statements the same way. A year earlier, on August 19, 2025, CNN reported that "Home Depot said Tuesday that some of its prices could be going up because of the cost of tariffs," quoting McPhail that "there will be modest price movement in some categories."[42] The next day, Newsweek reported that Home Depot would be "implementing 'modest' price increases to offset the 'significantly higher' duties on imported goods," and that Home Depot "has now joined the growing number of companies who say these are forcing them to pass some of their increased costs onto consumers."[43] Retail trade press called the announcement "a total reversal of what Home Depot stated in the spring."[44] Independent tracking of prices for nearly two million products on Home Depot's website beginning in March 2025 showed a "slow and steady increase in

[41] *The Home Depot, Inc., Q2 FY2026 Earnings Call Transcript*. August 18, 2026. Published by Seeking Alpha.
[42] *Home Depot Says It Will Raise Some Prices Because of Tariffs*, Chris Isidore, CNN (Aug. 19, 2025), (https://www.cnn.com/2025/08/19/economy/home-depot-tariffs-prices).
[43] *Home Depot Is Raising Prices*, Hugh Cameron, Newsweek (Aug. 20, 2025), (https://www.newsweek.com/home-depot-raising-prices-trump-tariffs-2116136).
[44] *Home Depot Issues Price Increase Warning*, Retail Customer Experience (Sept. 2, 2025), (https://www.retailcustomerexperience.com/news/home-depot-issues-price-increase-warning/).

most categories," with price increases of around 15% for affected items, increases of more than 20% in the window treatment and automotive sections, and price increases of just over 15% on 45% of the appliances Home Depot sold online.[45]




Article: *Home Depot tariff price increases, what do the numbers look like*[46]

48. Home Depot moved to secure the refund for itself. On May 19, 2026, McPhail told investors that "[w]e have filed for those tariff refunds," and that while Home Depot had "received an immaterial amount to date, we have assumed that, that could provide a significant offset to those costs."[47] On August 18, 2026, Home Depot confirmed that it had built the refunds into its financial guidance for the year:

[45] *Home Depot Tariff Price Increases, What Do the Numbers Look Like?*, Jennifer Burns, Substack (Sept. 15, 2025) (analyzing Bright Data price data). Retrieved from: https://datatellsthestory.substack.com/p/home-depot-tariff-price-increases
[46] *Id.*
[47] *The Home Depot, Inc., Q1 FY2026 Earnings Call Transcript*. May 19, 2026. Published by Seeking Alpha.

"Guidance includes IEEPA tariff refunds, which are expected to partially offset unplanned fuel, energy, and other product input costs throughout the fiscal year."[48]

49. Upon information and belief, Home Depot was the IOR for the merchandise it sold to Plaintiff and the Class and, as IOR, paid the IEEPA duties to CBP when the goods entered the United States. Home Depot reported that "as of August 2, 2026, we had received approximately $730 million in IEEPA tariff refunds, representing the vast majority of our expected refunds," and that "[a]proximately $685 million of these refunds were recognized as a reduction of cost of goods sold."[49] McPhail explained that Home Depot received the refunds "right around the end of the month of June," and that the $685 million "reduced our cost of goods sold as they applied to products that had already been sold."[50] In other words, the refunds Home Depot retained correspond to tariffs on goods Home Depot had already sold to its customers.

50. Home Depot tracks at least part of its customers' purchases. Its Pro Xtra loyalty program records members' purchases, and its online business and mobile application, which has approximately 20 million active users, record customer orders.[51] Home Depot therefore has the means to identify, and return tariff

---

[48] *The Home Depot, Inc., Current Report (Form 8-K)*, Ex. 99.1 (Aug. 18, 2026), (https://www.sec.gov/Archives/edgar/data/0000354950/000035495026000145/hd_exhibit991x08022026.htm).
[49] *The Home Depot, Inc., Quarterly Report (Form 10-Q)* (quarter ended Aug. 2, 2026), at 15.
[50] *The Home Depot, Inc., Q2 FY2026 Earnings Call Transcript*. August 18, 2026. Published by Seeking Alpha.
[51] *The Home Depot, Inc., Investor and Analyst Conference Transcript*. December 9, 2025. Published by FactSet CallStreet; *see also Home Depot Must Face Narrowed Lawsuit Over Full Refunds Policy*, Bloomberg Law

overcharges to, at least a subset of the consumers who paid them. Upon information and belief, Home Depot has not established, announced, or offered any process by which Plaintiffs or any class member may recover the tariff costs they paid. Instead, Home Depot told investors that the refunds "are being used to offset unplanned and rising cost pressures throughout the year."[52]

51. Home Depot has made clear that it intends to keep the refunds. McPhail described the IEEPA refunds as "a market-borne benefit," explained that Home Depot is "using those benefits to offset costs," and stated that "had we not had tariff refunds, we would have exceeded our expectations for the quarter regardless. It just came in a different form."[53]

52. Plaintiffs and class members paid tariff-inflated prices to Home Depot during the Class Period. Home Depot now seeks to retain the benefit of those consumer payments while also recovering, and keeping for itself, the refund of the same tariffs.

## D. Defendant Will Receive an Unjust Windfall from IEEPA Tariff Refunds

53. Following the Supreme Court's decision in *Learning Resource*s, nearly 2,000 importers began the process to recover tariff refunds from the federal government. On March 5, 2026, the CIT ordered refunds of IEEPA tariffs, holding

(https://news.bloomberglaw.com/class-action/home-depot-must-face-narrowed-lawsuit-over-full-refunds-policy) (describing Pro Xtra accounts that track members' purchases).

[52] *The Home Depot, Inc., Q2 FY2026 Earnings Call Transcript*. August 18, 2026. Published by Seeking Alpha.

[53] *Id.*

that "[a]ll importers of record" are "entitled to the benefit" of the Supreme Court ruling that struck down the IEEPA tariffs.[54] The Court ordered CBP to liquidate any and all unliquidated entries subject to IEEPA tariffs "without regard to the IEEPA duties," and ordered that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to those duties."[55]

54. The Executive Director of CBP's Trade Programs Directorate estimated that as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant to IEEPA is approximately $166 billion.[56] By Defendant's own figures, approximately $730 million in IEEPA tariff refunds, "representing the vast majority of [its] expected refunds."[57]

55. Despite being well aware of the numerous challenges to the legality of the IEEPA tariffs, Defendant deceived consumers by not informing them that it wouldn't refund duties paid by consumers to cover IEEPA tariffs even if they were later invalidated.

56. These funds were wrongfully taken from consumers to cover IEEPA tariffs that have since been invalidated.

---

[54] *Atmus Filtration, Inc. v. United States*, No. 1:26-01259 (U.S. Ct. Int'l Trade Mar. 5, 2026), ECF 29 at 1.
[55] *Id*. at 3.
[56] Declaration of Brandon Lord, *Atmus*, No. 1:26-01259 (U.S. Ct. Int'l Trade Mar. 6, 2026), ECF 31 at 6.
[57] *The Home Depot, Inc., Quarterly Report (Form 10-Q)* (quarter ended Aug. 2, 2026), at 15.

## V. CLASS ALLEGATIONS

57. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal and state law on behalf of the members of the following Class:

a. **Imported Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Home Depot a good that was itself subject to IEEPA tariffs, at a price that Home Depot increased to pass through the IEEPA tariffs assessed on that good.

b. **U.S.-Sourced Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Home Depot a U.S.-sourced good that was not itself subject to IEEPA tariffs, at a price that Home Depot increased to spread, recover, or offset across its product line the IEEPA tariff costs it incurred on its imported goods.

58. Excluded from the Class are Home Depot and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges'

immediate family members, judicial officers and their personnel, and all governmental entities.

59. The identity of all products encompassed within the Class definition, i.e., Class Products, are readily identifiable from Home Depot's records. The identity of Class members and their purchase records are available through multiple sources, including Class members' own transaction and payment records, Home Depot's records of Class Product purchases, and records maintained by payment processors and financial institutions associated with accepted forms of payment such as Visa card issuers, debit card providers, credit card companies, banks and mobile payment services.

60. Numerosity. Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are tens of millions of members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

61. Typicality. Plaintiffs' claims are typical of the claims of other Class members. The factual and legal bases of Home Depot's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class.

62. Adequate Representation. Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs

have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

63. Commonality. Common questions of law and fact predominate over questions that may affect only individual Class members because Home Depot has acted on grounds generally applicable to the Class and because Class members share a common injury. Determining damages on a class-wide basis is therefore appropriate. The overcharge injuries incurred by Plaintiff and each Class member arose from the same conduct alleged herein.

64. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a. Whether the higher prices that consumers paid for products sold by Home Depot are attributable to the cost of IEEPA tariffs;

b. Whether Home Depot is obligated to return the cost of IEEPA tariffs to the consumers who paid them in the form of higher prices;

c. Whether Home Depot's retention of elevated consumer payments constitutes unjust enrichment;

d. Whether Home Depot's use of IEEPA tariff-related funds to benefit Home Depot's business and political interests was unlawful;

e. Whether Home Depot acted unlawfully by upcharging consumers in response to IEEPA tariff-related costs while making statements to the contrary;

f. Whether Home Depot's conduct constitutes an unlawful business or trade practice by collecting tariff-related surcharges from consumers while misrepresenting its pricing practices and failing to establish a consumer refund mechanism once reimbursed;

g. Whether Home Depot's conduct has harmed Plaintiffs and the Class uniformly; and

h. The measure of damages or restitution available to Plaintiffs and the Class due to increased prices caused by Home Depot's IEEPA tariff pass-through.

65. Prevention of inconsistent or varying adjudications: Individual prosecution of the claims alleged herein would likely yield inconsistent or varying results, establishing incompatible standards of conduct for Home Depot. Certification of the proposed Class would prevent this outcome.

66. Injunctive Relief. By way of its conduct described in this complaint, Home Depot has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

67. Predominance and Superiority. A class action is superior to other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by individual Class members are relatively small compared to the burden of individual prosecution of this complex litigation. Individual lawsuits would risk inconsistent judgments and increase delay and expense for all parties. A class action presents fewer administrative difficulties. Class members are ascertainable through methods typical of class action practice, including Home Depot's own records and consumers' proof of purchase.

## VI. CLAIMS FOR RELIEF

### COUNT I - UNJUST ENRICHMENT

68. Plaintiffs incorporate by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

69. Plaintiffs bring this Count on behalf of all Class members.

70. Plaintiffs and the Class have conferred a benefit upon Home Depot in the form of money paid through tariff-inflated prices on goods during the period February 4, 2025, through February 20, 2026.

71. Home Depot received and accepted that benefit and was thereby enriched. Home Depot has retained the benefit conferred by Plaintiffs even after receiving tariff refunds without paying or otherwise compensating Plaintiffs for its value.

72. The circumstances surrounding Home Depot's receipt and retention of this benefit make it unjust and inequitable for Home Depot to continue to retain it without reimbursement to Plaintiffs. Home Depot obtained these funds through price increases on goods subject to unlawful tariffs and has retained the resulting profits along with ongoing tariff refunds.

73. Under principles of equity and good conscience, Home Depot should not be permitted to retain those ill-gotten profits when Home Depot is seeking,must seek, or has already obtained a refund of the duties it paid.

74. Plaintiffs and the Class have no adequate remedy at law.

75. Plaintiffs and the Class are entitled to full disgorgement and restitution of any money Home Depot has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT II - MONEY HAD AND RECEIVED**

76. Plaintiffs incorporate by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

77. Plaintiffs bring this Count on behalf of all Class members.

78. Home Depot received funds from Plaintiffs and from each member of the putative Class in the form of an IEEPA tariff surcharge. The Supreme Court has determined that the IEEPA tariffs were unlawful.

79. The funds belonged to Plaintiffs and to each member of the putative Class.

80. Home Depot has not returned the funds despite availing themselves of tariff refunds. Under principles of equity and good conscience, Home Depot should not be permitted to retain those ill-gotten funds. Plaintiffs seek the return of the funds in an amount to be proven at trial.

81. Plaintiffs seek all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**COUNT III - FALSE AND MISLEADING ADVERTISING IN VIOLATION OF O.C.G.A. § 10-1-421 AND THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT, O.C.G.A. §§ 10-1-370–10-1-375**

82. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

83. Plaintiff brings this Count on behalf of all Class members.

84. Georgia law prohibits any person, with intent to dispose of property or to induce the public to enter into any obligation relating thereto, from making or disseminating before the public in this state, by any manner or means, any statement concerning such property, or concerning any circumstance or matter of fact connected with its disposition, which is untrue or fraudulent and which is known, or which by the exercise of reasonable care should be known, to be untrue or fraudulent.

See O.C.G.A. § 10-1-421(a). Georgia law further provides that a person engages in a deceptive trade practice when, in the course of business, the person engages in conduct that creates a likelihood of confusion or of misunderstanding. See O.C.G.A. § 10-1-372(a)(12).

85. The purpose of O.C.G.A. § 10-1-421 and the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") is to protect consumers from advertisements and promotional statements that are deceptive, misleading, or likely to induce consumers to purchase goods based upon false or incomplete information.

86. A claim under the GUDTPA may be established through affirmative misrepresentations of material fact, or through the concealment or omission of material facts where such omissions render statements misleading and create a likelihood of confusion or of misunderstanding. A complainant need not prove competition between the parties or actual confusion or misunderstanding, O.C.G.A. § 10-1-372(b), nor monetary damage, loss of profits, or intent to deceive, O.C.G.A. § 10-1-373(a).

87. At all relevant times, Defendant engaged in the regular course of trade and commerce in Georgia by marketing, distributing, supplying, offering for sale, and/or selling merchandise to consumers in Georgia.

88. Defendant unlawfully and unfairly charged customers inflated prices to cover the costs of IEEPA Tariffs while representing that Defendant's prices were not

increasing in response to the IEEPA Tariffs. Defendant also failed to disclose to consumers that it did not intend to seek a refund of IEEPA Tariff payments from the federal government even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests and seek favorable treatment from the Trump Administration. This information was material to Plaintiff's purchasing decisions, and but for Defendant's misleading advertisements, representations, and omissions, Plaintiff and the Class would not have purchased products from Defendant or would have paid less for such products.

89. Defendant's representations that its prices were not increasing in response to the IEEPA Tariffs were untrue, and Defendant knew, or by the exercise of reasonable care should have known, that they were untrue, in violation of O.C.G.A. § 10-1-421(a). Defendant's representations, omissions, advertisements, and marketing practices also constituted deceptive trade practices within the meaning of O.C.G.A. § 10-1-372(a)(12), because they created a likelihood of confusion or of misunderstanding among reasonable consumers regarding the nature, basis, and justification for Defendant's pricing practices.

90. Defendant's practices, as alleged herein, are injurious to the public interest, as they have the capacity to injure other persons, including the millions of consumers who shop in Defendant's brick-and-mortar and/or online stores.

91. Plaintiff and the Class were misled by Defendant's advertisements, representations, and omissions. They are persons aggrieved by, and likely to be damaged by, Defendant's continuing deceptive trade practices within the meaning of O.C.G.A. §§ 10-1-373(a) and 10-1-423. Defendant continues to seek, receive, and/or retain IEEPA Tariff refunds without disclosing their disposition to consumers.

92. As a direct and proximate result of Defendant's misleading advertising and deceptive conduct, Plaintiffs and the Class have been injured and will continue to be injured absent injunctive relief. Defendant willfully engaged in these practices knowing them to be deceptive.

93. Plaintiffs and the Class are entitled to injunctive relief under O.C.G.A. §§ 10-1-373(a) and 10-1-423. That relief should enjoin Defendant from continuing its misleading tariff-related pricing representations and require Defendant to disclose, preserve, and account for any IEEPA Tariff refunds it has sought or received. Plaintiff and the Class are also entitled to costs and attorneys' fees under O.C.G.A. § 10-1-373(b), together with such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;
B. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;
C. Declaratory relief that Defendant must return to Plaintiffs and the proposed Class all funds paid by consumers to cover an IEEPA tariff surcharge, with interest;
D. Costs, restitution, damages, including statutory, treble, punitive, and nominal damages, and disgorgement in an amount to be determined at trial;
E. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;
F. An award of costs and attorneys' fees; and
G. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: November 9, 2006

Respectfully submitted,

*/s/ Alison L. Divine*

Alison L. Divine (GA # 672129)
**Napoli Shkolnik PLLC**
730 Peachtree St. NE # 570
Atlanta, Georgia 30308
T: (202) 397-1000 ext. 2542
adivine@napolilaw.com

*/s/ Michael J. Fuller, Jr.*
Michael J. Fuller, Jr., FL Bar No. 173797 *(Pro Hac Vice Application Filed)*
**Farrell & Fuller Law**
270 Munoz Rivera Ave. Ste. 201
San Juan, PR 00918
T: 939-293-8244
F: 939-293-8245
mike@farrellfuller.com

*Counsel for Plaintiffs and Proposed Class*